UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **VERSUS** | **NO: 08-0286** |
| **ERIN SCHMIDT ET AL.** | **SECTION: "S" (5)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the United States of America's motion for summary judgment is **GRANTED** as to the claim of constructive fraudulent conveyance, the avoidance of the transfers under the Federal Debt Collection Procedures Act, and annulment of the transfers under the Louisiana Civil Code; **GRANTED** as to the claim for a money judgment against Erin Schmidt; and **DENIED** as to a money judgment against Keith Nunez. (Document #69.)

**IT IS FURTHER ORDERED** that the cross-motion for summary judgment of Erin Schmidt and Keith Nunez is **DENIED** as to the United States of America's claim for constructive fraudulent conveyance, avoidance, and annulment; **DENIED** as to the government's claim for a money judgment as to Erin Schmidt; and **GRANTED** as to the government claim for a money judgment as to Keith Nunez. (Document #76.)

**IT IS FURTHER ORDERED** that Michael O'Keefe, Sr.'s motion for summary

judgment is **DENIED**. (Document #77.)

**I. BACKGROUND**

The underlying facts are undisputed. On March 21, 1996 Michael O'Keefe, Sr. was convicted of one count of conspiracy to commit mail/wire fraud, six counts of mail/wire fraud, and ten counts of money laundering. O'Keefe was sentenced on January 12, 1999, to a term of imprisonment of 235 months and ordered to pay restitution to the Physicians' Liability Risk Retention Group in the amount of $1,174,849.

Because of his tenure in the Louisiana legislature, O'Keefe was entitled to monthly pension payments under the Louisiana State Employees' Retirement System (LASERS). On March 24, 1999, shortly before beginning to serve his sentence, O'Keefe sent a request to LASERS that his pension payments, in the amount of approximately $2,500 per month, be made by paper check though the United States mail, rather than by electronic direct deposit.

From November 2001 through November 2004, pension checks totaling $92,645.55 were sent to a post office box in New Orleans, and deposited into an account at Whitney National Bank in the name of Keith Nunez, a former employee and close personal friend of O'Keefe. A portion of the funds in the Nunez account were transferred to Erin Schmidt, O'Keefe's daughter, through checks, and other portions were used to pay Schmidt's personal expenditures, including country-club dues, credit-card bills, insurance premiums, utility bills, and educational expenses for O'Keefe's grandchildren.

From December 2004 through October 1, 2005, O'Keefe's pension checks from

LASERS were deposited into an account at Capital One Bank in the name of Erin Schmidt. During this period, Schmidt received $27,770.88 from this account. On October 19, 2005, the court modified O'Keefe's judgment to provide that "the payment of restitution shall begin upon commencement of defendant's term of supervised release." On June 26, 2008, the court vacated the modification order and reinstated the original terms of the judgment. Therefore, the relevant period in this case is December 2004 through October 1, 2005.

On December 13, 2007, the United States filed applications for writs of execution against the Whitney and Capital One bank accounts. The Whitney account had been liquidated and closed, and the Capital One account had $2,927.38 remaining. On January 10, 2008, the United States filed a civil complaint, and on July 31, 2008, an amended complaint against Schmidt, Nunez, and O'Keefe seeking avoidance of the transfers under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3301 *et seq.*; a claim for a money judgment for the value of the transferred payments; a revocatory action to revoke and annul the transfers under the Louisiana Civil Code; and a claim for a money judgment under the Louisiana Civil Code.

The United States filed a motion for summary judgment. Nunez, Schmidt, and O'Keefe filed cross motions for summary judgment.

## II. DISCUSSION

### A. Legal standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805,
3

809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).

**B. FDCPA**

The government alleges that O'Keefe fraudulently transferred his pension payments to his daughter through bank accounts in her name and in Nunez's name, in violation of the FDCPA, 28 U.S.C. § 3304(a)(1)(A) and (B). The government seeks avoidance of the transfers.[1]

The United States "may obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States." 28 U.S.C. § 3306(a)(1). Section 3304[2] provides in relevant part:

> (a) **Debt arising before transfer**. – Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to the debt to the United States which arises before the transfer is made or the obligation is incurred if--
> (1)(A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
> (B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation.

---

[1] The Mandatory Victim Restitution Act (MVRA) provides the government authority to enforce private victim restitution through the FDCPA. See United States v. Phillips, 303 F.3d 548, 550-51 (5th Cir. 2002); 18 U.S.C. § 3664(m)(1)(A)(i)-(ii); 18 U.S.C. § 3613(a). Under the MVRA, Congress directed the attorney general to enforce restitution orders and to commit the resources necessary to ensure that the rights of victims are enforced. Id. at 551.

[2] Section 3304(a)(1) mirrors the fraudulent-transfer provisions of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B)(i)-(ii). The court may look to bankruptcy cases that address fraudulent transfer.

Section 3301 defines transfer as follows:

(6)    Transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

**1. Reasonably equivalent value**

The first question is whether O'Keefe received reasonably equivalent value when he arranged to send pension checks to the Whitney and Capital One accounts for the benefit of Schmidt and her children. "[A] person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale of execution of a power of sale for the acquisition or disposition of such interest upon default under a mortgage, deed of trust, or security agreement." 28 U.S.C. § 3303(b).

The government argues that no property of reasonably equivalent value was exchanged for the transferred LASERS funds. The defendants admit that O'Keefe received nothing tangible in exchange for the payments. They argue, however, that O'Keefe received reasonably equivalent value when he provided for the household expenses of his daughter and her children.

The defendants rely on United States v. Goforth, 465 F.3d 730 (6th Cir. 2006), in which the government asserted that Defendant George Gilley's spouse was liable under the FDCPA for monthly payments from 1977 to 1996 for household expenses. The Court of Appeals held that a debtor/husband who paid living allowances to a spouse or co-habitant received reasonably equivalent value, and the transfer was not fraudulent under the FDCPA. Further, in In re Fisher, 296 Fed.Appx. 494, 501 (6th Cir. 2008) (a bankruptcy case), the Court of Appeals cited Goforth

at 736, stating "that a debtor does indeed receive 'reasonably equivalent value' when he/she makes payments to his/her spouse (or cohabitant) that are used for household expenses."

The government argues that the spousal exception is not widely incorporated into the FDCPA's definition of reasonably equivalent value. Notwithstanding, the government contends that the spousal exception does not apply in this case because Schmidt is not a spouse. Moreover, the government contends that the transferred property was not used for the household expenses of O'Keefe's dependents, but for the expenses of a non-dependent, adult child, some of which were non-essential. See Matter of Treadwell, 699 F.2d 1050, 1051 (11th Cir. 1983) (Section 548 bankruptcy case) (love and affection of daughters does not protect transfer; value does not include an unperformed promise to furnish support to a relative of the debtor); In re Marlar, 267 F.3d 749, 755 (8th Cir. 2001) (bankruptcy case) (debtor's transfer of property to son two days before marriage for "ten dollars with love and affection" was not reasonably equivalent value for over 700 acres of farmland); United States v. Sherrill, 2009 WL 1475852 (M.D. Ga. 2009) (FDPCA case) (quitclaim deed conveying property to wife "in consideration of $10, love and affection, and other good and valuable consideration" shortly before incurring substantial debt found to be fraudulent transfer).

The court concludes that O'Keefe did not receive reasonably equivalent value for the transfer of his pension checks. In her deposition, Schmidt testified that she is married with children, and that her father maintained a separate home prior to his incarceration. Accordingly, the spousal exception does not apply, and there is no authority for an exception for an adult, married child who did not maintain a household for O'Keefe.

### 2. O'Keefe's insolvency

The government argues that O'Keefe was insolvent throughout the period of the transfers. "[A] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 28 U.S.C. § 3302(a). "A debtor who is generally not paying debts as they become due is presumed to be insolvent." Id. at (b).

The government presents a chart summarizing evidence of O'Keefe's debts and assets. On January 12, 1999, O'Keefe was ordered to pay restitution of $1,174,849, and the present balance due is $1,160,405.31. The government references O'Keefe's sworn affidavit in the record of his criminal case (No. 95-0106, document #920) that his family and friends send him whatever funds he needs in prison, he received funds for voluntary restitution payments from family members for about six years, and he had no liquid assets available in 2005. In October 2005, O'Keefe filed a motion to clarify his judgment and commitment (document #818), in which he noted that he had significant debts and was unable to pay attorney's fees.

Nunez and Schmidt state in their answers to interrogatories and in their depositions that they have no knowledge of O'Keefe's remaining assets to establish his solvency after entry of the restitution judgment. Moreover, they do not put forth an argument in the cross motion for summary judgment that he was not insolvent.

Accordingly, the defendants have not raised an issue of material fact regarding O'Keefe's insolvency, and the court concludes that the sum of O'Keefe's debt was greater than his assets at the time of the transfer.

### 3. Statute of limitations

The defendants contend that the government's claim for at least a portion of the payments is time-barred. The defendants argue that the claim for relief must be brought within six years after the transfer, and the government waited almost seven years before it took and action.

"A claim for relief with respect to a fraudulent transfer or obligation . . . is extinguished unless action is brought– . . . (2) under subsection (a)(1) or (b)(1)(B) of section 3304 within 6 years after the transfer was made or the obligation was incurred." 28 U.S.C. § 3306(b).

The government concedes that the three transfers made to Nunez's account in November and December 2001 and on January 2, 2002, occurred more than six years before the present action was filed on January 10, 2008. Accordingly, those claims are time-barred under the FDCPA.

**4. Remedy under the FDCPA**

There are no disputed issue of material fact, and the United States in entitled to judgment as a matter of law on its claim that O'Keefe engaged in constructively fraudulent transfers of his pension payments to his daughter through bank accounts in her name and in Nunez's name, in violation of the FDCPA. The United States is entitled to avoidance of the transfers, to the extent the claims for avoidance are not time-barred, to satisfy the debt to the United States.

**C. Revocatory action under Louisiana law**

The government argues that the three transfers to the Nunez account in November and December 2001 and on January 2, 2002, that are time-barred under the FDCPA, are subject to a revocatory action under article 2036 of the Louisiana Civil Code, which is equivalent to a FDCPA action to void fraudulent transfers. The government argues that although Louisiana law

8

provides a one-year prescriptive and a three-year peremptive period for revocatory actions, the time limitations do not apply when the United States invokes state-law remedies. See United States v. Kellum, 523 F.2d 1284, 1287 (5th Cir. 1975) (unless the United States waived its immunity from the applicability of the state prescriptive or peremptive period, the statute does not apply when the government seeks to enforce a judgment for the recovery of money owed the United States).

A revocatory action "is the civil law analogue to the common law suit to set aside a fraudulent conveyance." La. Civil Code art. 2036, Revision Comment (c). Article 2036 provides: "An obligee has a right to annul an act of the obligor . . . made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency." "The term 'act' . . . encompasses contracts, acts of payment, and any 'contrivance' employed by an obligor to defeat his obligee's rightful claim." Id. at Revision Comment (d). "Once a creditor alleging insolvency of a debtor shows the amount of debts, it is then incumbent upon the debtor to show that he has retained assets of an equal or greater value." In re Accurate Home Inspectors, Inc., 348 B.R. 354, 361 (Bkrtcy. E.D. La. 2005) (applying article 2036).

O'Keefe first transferred pension payments in November 2001, after the restitution judgment was rendered in January 1999. As in the claim under the FDCPA, the government alleges that O'Keefe was insolvent when the payments were made, and the defendants do not present evidence to show that O'Keefe retained assets of an equal or greater value when he acted to make the pension payments to the Whitney and Capital One accounts for the benefit of his daughter and grandchildren.

Accordingly, there are no disputed issues of material fact, and the United States is entitled to judgment as a matter of law on its claim for a revocatory action. The transfers to Nunez's account in November and December 2001 and on January 2, 2002, are annulled under Louisiana law.

**D. The claims for money judgments under the FDCPA and Louisiana law**

The government alleges that it is entitled to a money judgment against Nunez of $92,645.55 and against Schmidt of $27,770.88, the value of the LASERS payments transferred to the Whitney account in Nunez's name and to the Capital One account in Schmidt's name during the relevant period.

    1. **Nunez**

The government presents the declaration of Josephine Beninati, a licensed certified public account employed by the Department of Justice who has reviewed the bank records for the Nunez Whitney account and the Schmidt Capital One account. From November 1, 2001 until November 1, 2004, LASERS deposited 37 checks of approximately $2,500 per check in the Nunez Whitney account. Declaration, exh. A. The total amount deposited was $92,645.55. On a monthly basis, checks were made payable to Schmidt in amounts from $1,000 to $1,500. Other portions of the Whitney funds were used to pay Schmidt's personal expenditures, including country-club dues, credit-card bills, insurance premiums, and utility bills. The payments were identified by the notation in the memo line of the checks.

Nunez argues that he did not receive any of the transferred funds. He argues that he is simply a conduit for payment to Schmidt and that he is not a transferee of the pension payments.

10

Nunez offers his deposition testimony in support of his argument that the government is not entitled to a money judgment against him.

Nunez testified in his deposition that he has known O'Keefe since 1975 when he worked for him at the Beverly Dinner Playhouse as a parking lot attendant. Nunez developed a friendship with O'Keefe's son, Michael, in 1978 and, through that friendship, became better acquainted with O'Keefe. Nunez worked with several companies over the years in property management, but he was not certain of O'Keefe's business interest in some of the companies. Nunez developed a personal friendship with O'Keefe, which he currently maintains. Nunez visited O'Keefe in prison in Beaumont, Texas, six or seven times and speaks to him by telephone weekly or monthly.

O'Keefe directed LASERS to send his pension checks to a post office box in Mid-City that belonged to Administrative, Inc., a property management company for which Nunez worked. Nunez did not have a key to the Mid-City post-office box. Nunez neither retrieved the checks from the post office box, endorsed them, nor deposited them in his account. Nunez testified that Debbie Keen, the bookkeeper for Administrative Inc., requested that he open the Whitney account. None of his personal funds were deposited in the account; Nunez had a personal account with Capital One. He testified that he did not speak to O'Keefe about the checks and did not know that the checks were being deposited into the Whitney account until after Hurricane Katrina.

When the bank statement arrived at his home, Nunez would give it to Debbie unopened. Debbie or her assistant, Terry Bruce, would write checks on the account and give Nunez a folder

with checks for his signature. Nunez noticed from the "memo line" that the money was paid for the benefit of O'Keefe's daughter and grandchildren.

The government does not offer evidence to challenge the facts offered by Nunez in his deposition. Based on the undisputed testimony, the court concludes that, although the transfer of funds deposited in the Whitney account is subject to avoidance and annulment, Nunez is not liable as a transferee of those funds.

In <u>United States on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren et al.</u>, 841 F.Supp. 899 (D.Minn. 1993), the law firm of Larkin Hoffman assisted in making fraudulent transfers by backdating various gift documents in order to keep them beyond the reach of the FTC. The court stated that the party with legal title to the property is the proper party to be sued as transferee in fraudulent transfer claims. <u>Id</u>. at 903. The court held that Larkin Hoffman was not a transferee and thus not subject to the fraudulent provision of the FDCPA. <u>Id</u>. at 908.

Nunez facilitated the transfer of the funds to Schmidt in an even lesser capacity than Larkin Hoffman. Other than opening the account and signing his name to checks at the direction of others, there is neither an allegation nor evidence that he took control over the funds or had knowledge of their origin or purpose. Accordingly, there are no disputed issues of material fact, and Nunez is entitled to judgment as a matter of law, dismissing the United States' claim for a money judgment against him.

### 2. Schmidt

From December 1, 2004 until August 1, 2007, LASERS deposited 33 checks in the

amount of approximately $2,600 in Schmidt's Capital One account. Declaration, exh. B. The total deposits to Schmidt's account from LASERS was $84,341.34. The government seeks $27,770.88 that was deposited into the Capital One account from December 2004 through October 1, 2005, the period in which the original terms of the Judgment and Commitment were in effect and the restitution debt was due immediately.

As to the funds deposited in the Schmidt account from December 2005 through October 2005, there are no disputed issues of material fact, and the United States is entitled to a money judgment against Schmidt in that amount. Although the government presents evidence that Schmidt ultimately received benefits of the funds deposited in the Nunez account, the motion for summary judgment seeks judgment against Schmidt only in the amount of $27,770.88 plus interest, costs, and expenses.

Accordingly, there are no disputed issues of material fact, and the government is entitled to a money judgment as a matter of law against Schmidt for $27,770.88[3] deposited in the Capital One account. The court does not award interest, and each party is to bear its own costs and expenses.

**E. Section 3013 denial of remedy**

The defendants contend that the court should deny the government's ability to revoke the transfers. The defendants argue that they committed no fraud and acted in good faith.

Section 3013 provides:

---

[3] The parties do not raise the issue of whether the government is entitled to the full amount or a percentage of the LASERS funds.

> The court may at any time on its own initiative or the motion of any interested person, and after such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure under this chapter.

"[Section] 3013 provides a defendant with a layer of protection against abuse or potential abuse by the Government." United States v. Lawrence, 538 F.Supp.2d 1188, 1195 (D.S.D. 2008).

> Any enforcement remedy . . . is bound to have an adverse impact on a defendant. The Government should always attempt to minimize the impact to the defendant . . . when deciding what remedy to utilize. That does not mean, however, that the Government must eliminate the impact altogether. Instead, it must act in a reasonable and responsible manner, based on the situation at hand.

The court declines to deny the avoidance of the transfers at this time. The absence of fraud and presence of good faith are not proper grounds for denial of the transfer avoidance under § 3013. The defendants do not allege abuse or potential abuse by the government, and they provide no evidence of the impact of the avoidance of the transfers. Moreover, the transfers are subject to revocation under Louisiana law, and § 3013 applies to the use of enforcement under the FDCPA. The court encourages the government to act in a reasonable manner to work with Schmidt to minimize the adverse impact of the judgment.

### III. CONCLUSION

There are no disputed issues of material fact, and the government is entitled to judgment as a matter of law on the claim that O'Keefe engaged in constructive fraudulent conveyance of LASERS payments. The transfer is void under the FDCPA and annulled under the Louisiana Civil Code. The government is entitled to a money judgment against Schmidt for $27,770.88

14

deposited in the Capital One account. Nunez is entitled to summary judgment on his claim that he is not a transferee and, thereby, not liable to the government.

New Orleans, Louisiana, this __4th__ day of December, 2009.

**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**